UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | |
|---|---|
| In re:<br><br>TABULA RASA PARTNERS, LLC,<br><br>Debtor.[1] | § <br>§ Chapter 11<br>§<br>§<br>§ Case No. 21-33859<br>§<br>§<br>§ |

### DECLARATION OF MICHAEL KEENER IN SUPPORT OF CHAPTER 11 PETITION AND FIRST DAY PLEADINGS

I, Michael Keener, being duly sworn, depose and say:

1. I am the Independent Director of Tabula Rasa Partners, LLC ("TRP" or the "Debtor"). I am over the age of 18, competent to testify, and authorized to submit this declaration (the "Declaration") on behalf of the Debtor.

2. I have served as the Independent Director of the Debtor since May 17, 2021. Other members of the board of directors are appointed by the Debtor's equity holder and secured lender. As a result of this conflict and in my capacity as independent director, I have been appointed as the sole board member with authority to act on behalf of the Debtor in connection with this chapter 11 case (the "Chapter 11 Case") and any proposed restructuring. I am generally familiar with the Debtor's assets, liabilities and operations.

3. Except as otherwise noted, all facts set forth in this Declaration are based on my personal knowledge, my discussions with members of the Debtor's senior management, my review of relevant documents or, based on my experience and knowledge of the Debtor's operations and financial conditions, and my opinion. In making this Declaration, I have relied, in part, on

---

[1] The Debtor's service address for purposes of this chapter 11 case is 1455 West Loop South, Suite 230, Houston, TX 77027.

1

13108630.v2

information and materials that the Debtor's personnel and advisors have gathered, prepared, verified, and provided to me in each case under my ultimate supervision, at my direction and/or for my benefit in preparing this Declaration. If I were called to testify as a witness in this matter, I would testify competently to the facts set forth herein.

4.      To resolve immediate issues that may cause irreparable harm if not promptly addressed, the Debtor intends to request various types of relief in "first day" applications and motions (collectively, the "First Day Pleadings") in connection with this Chapter 11 Case.[2] I submit this declaration in support of the Debtor's (a) voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") and (b) the First Day Pleadings. I am generally familiar with the Debtor's day-to-day operations, business and financial affairs, and the circumstances leading up to this Chapter 11 Case.

5.      This Declaration is divided into two parts. Part I provides background information about the Debtor, its business operations, corporate and capital structures, and the circumstances surrounding the commencement of the Chapter 11 Case. Part II discusses the First Day Pleadings.

## PART I – BACKGROUND

### A. Overview

6.      On December 3, 2021 (the "Petition Date"), the Debtor filed this Chapter 11 Case. On the Petition Date, the Debtor also filed a motion (which is not a First Day Pleading) to reject its midstream agreements with Sunoco Pipeline L.P. Rejection of these agreements is critical to maximizing the value of the Debtor's assets. If rejection of these agreements is approved, the Debtor intends to employ an investment banker and run a marketing process for a sale of its assets

---

[2] Capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First Day Pleadings.

2

pursuant to Section 363 of the Bankruptcy Code. Given the impact of rejection on the value of the assets, the Debtor determined it would not be beneficial to begin a marketing process until this threshold issue has been decided.

**B. The Debtor's Business and Corporate Structure**

7. TRP is a Houston, Texas based exploration and production company. TRP is a working interest owner in two active oil-producing assets in the Central Basin Platform of the Permian Basin in West Texas, the East Seminole San Andres Unit and Lindoss Unit in Gaines County and the Emma San Andres Unit and Emma Cowden Glorietta Unit in Andrews County. These assets are operated by Perdure Petroleum, LLC ("Perdure"), another working interest owner. Pursuant to a joint operating agreement, Perdure is responsible for the payment of all trade vendors, independent contractors, and royalties on a monthly basis. TRP is also a working interest owner in the La Veta asset which is a $CO_2$ source field in Huerfano County, Colorado. The La Veta asset is currently shut-in, and its associated gas plant is idled. Perdure contract operates the La Veta field.

8. In July 2018, Cibolo Energy Partners I, LP ("Cibolo") provided TRP a senior secured first lien facility to buyout an existing volumetric production payment, reduce existing payables, and provide development capital. Over the next two years, Cibolo funded additional debt that was used for field development and $CO_2$ purchases. Due to low oil prices during the depth of the COVID-19 crisis, certain fields were shut in and, in July 2020, TRP entered into an out-of-court financial restructuring agreement with the equity sponsor. The fields have since been returned to production. Cibolo converted a portion of its debt into equity and now owns 100% of the equity in TRP. Additionally, in September 2020, TRP sold a small working interest position in the Emma and Seminole fields to Perdure.

9. The Debtor's organizational structure is straightforward. Cibolo TRP, LLC owns 100% of the equity interests of the Debtor. Cibolo owns 100% of Cibolo TRP, LLC. The Debtor owns 100% of the equity in two non-Debtor subsidiaries, Tabula Rasa Resources, LLC and Tabula Rasa CO2, LLC.

### C. The Debtor's Management

10. In addition to myself, the other board members of Tabula Rasa Partners, LLC are Justin Teltschik and JW Sikora, each of whom were appointed by and have an interest in Cibolo.

11. The Debtor does not have any employees.

### D. The Debtor's Capital Structure

12. The following description of the Debtor's capital structure is for informational purposes only and is qualified in its entirety by reference to the documents setting forth the specific terms of such obligations and their respective related agreements.

13. On July 12, 2018, Cibolo entered into a Note Purchase Agreement, pursuant to which Cibolo held approximately $15 million of notes. The Debtor's obligations under the Note Purchase Agreement are secured by liens on all of the Debtor's assets.

14. On or about July 9, 2018, the Debtor entered into that certain ISDA Master Agreement with BP Energy Company ("BP") (the "Hedging Agreement"). The Debtor's obligations under the Hedging Agreement are secured by liens on all of the Debtor's assets.

15. On July 12, 2018, the Debtor, BP, and Cibolo entered into an Intercreditor Agreement pursuant to which the obligations to and liens held by BP and Cibolo are *pari passu*.

16. Between July 2018 and March 2020, Cibolo subsequently funded an incremental $25 million under the Note Purchase Agreement to finance $CO_2$ purchases and field development bringing the Debtor's total secured debt amount to $40 million.

17. On July 31, 2020, Cibolo and the Debtor refinanced the debt by amending and restating the Note Purchase Agreement (the "Amended Note Purchase Agreement"). Pursuant to the Amended Note Purchase Agreement, Cibolo exchanged approximately $19.8 million of the Debtor's obligations under the Amended Note Purchase Agreement for 100% of the equity interests in the Debtor, leaving approximately $22.2 million owed on the Amended Note Purchase Agreement.

18. As of the Petition Date, the total amount due under the Amended Note Purchase Agreement is approximately $19.9 million. The maturity date for the obligations under the Amended Note Purchase Agreement is July 12, 2022.

19. As of the Petition Date, there are no amounts due under the Hedging Agreement. As of the Petition Date, the mark-to-market liability on the Hedging Agreement was approximately $1 million (in amounts due from the Debtor).

20. The Debtor estimates that their total, undisputed pre-petition trade debt is approximately $200,000.00 owed to Sunoco.

E. Events Leading to Bankruptcy

21. The value of the Debtor's assets is significantly depressed due to the burden of (a) the Pipeline Throughput and Deficiency Agreement, dated as of May 2, 2017, by and among Sunoco Pipeline L.P. ("Sunoco"), and the Debtor (the "Throughput Agreement"); and (b) the Connection Agreement, dated as of May 2, 2017, by and between Sunoco and the Debtor (the "Connection Agreement," and together with the Throughput Agreement, the "Midstream Agreements"). The Debtor negotiated with Sunoco in good faith on a potential amendment to the Midstream Agreements, on three separate occasions, that may have avoided the need for this chapter 11 filing, but the parties were not able to reach a final agreement on any of these attempts.

22. The Debtor believes the total cost of the Sunoco agreement significantly outweighs the cost of trucking the production from the Texas properties primarily due to the deficiency payments attributable to the Midstream Agreements which will escalate over the next few years due to decreasing production and higher minimum volume requirements

23. The Debtor believes that the value of their assets will not come close to the amount of secured debt encumbering those assets while the Midstream Agreements are in effect. However, if the Debtor was not burdened by the Midstream Agreements, the Debtor believes that the value of its assets may meet or exceed the secured debt.

24. The Debtor filed this case in order to facilitate a transaction for the Debtor's assets prior to the maturity date of the Amended Note Purchase Agreement. Absent a settlement with Sunoco regarding the Midstream Agreements, the Debtor believes that this Chapter 11 Case is the best alternative to address the upcoming maturity of the Amended Note Purchase Agreement. On the Petition Date, the Debtor filed a motion to reject the Midstream Agreements. Although filed on the Petition Date, emergency relief is not being sought on the motion to reject. After the Midstream Agreements are rejected, the Debtor intends to retain an investment banker and run a marketing process targeting a sale of the Debtor's assets pursuant to Section 363 of the Bankruptcy Code prior to the July 2022 maturity date under the Amended Note Purchase Agreement.

## PART II – FIRST DAY MOTIONS[3]

25. Contemporaneously herewith, the Debtor has filed a number of First Day Motions seeking orders granting various forms of relief intended to stabilize the Debtor's business operations, facilitate the efficient administration of the Chapter 11 Case, and expedite a swift and smooth restructuring of the Debtor's balance sheet, including:

---

[3] Capitalized terms not otherwise defined in this section have the meanings ascribed to them in the applicable motion.

A. **Finance Motions:**

- **Cash Management Motion:** Debtor's Emergency Motion for Interim and Final Orders (I) Authorizing the Debtor to (A) Continue Operating its Cash Management System and Honor Certain Prepetition Obligations, and (B) Maintain Existing Bank Accounts and Business Forms, and (II) Granting Related Relief.

- **Cash Collateral Motion:** Emergency Motion for Interim and Final Orders (I) Authorizing Use of Cash Collateral, and (II) Granting Related Relief.

B. **Operational Motions:**

- **Hedge Motion:** Debtor's Emergency Motion for Entry of an Order (I) Authorizing the Debtor to (A) Perform Under and Amend Prepetition Hedging Agreement, (B) Enter into and Perform Under Postpetition Hedging Agreements, (C) Grant Liens and Superpriority Administrative Claims; (II) Modifying the Automatic Stay; and (III) Granting Related Relief.

- **JIB Motion:** Debtor's Emergency Motion for Interim and Final Orders Authorizing (I) Payment of Joint Interest Billings, Interest Owner Payments and GTP Costs and Adjustments and (II) Financial Institutions to Receive, Process, Honor, and Pay All Checks Presented for Payment and to Honor all Funds Transfer Requests Related to Such Obligations.

26. I am familiar with the content and substance of the First Day Motions. I have consulted with advisors regarding and understand each of the First Day Motions and the relief requested therein. To the best of my knowledge and belief, the factual statements contained in each of the First Day Motions are true and accurate and each such factual statement is incorporated herein by reference.

27. I believe that the relief requested in the First Day Motions is necessary, in the best interests of the Debtor's estate, creditors, and all other parties in interest, and will allow the Debtor to operate with minimal disruption and maximum value preservation during the pendency of the Chapter 11 Case. I also understand that the relief requested in the First Day Motions is supported by Cibolo. Failure to grant the relief requested in any of the First Day Motions may result in immediate and irreparable harm to the Debtor, the business, and the estate. Accordingly, for the

7

13108630.v2

reasons set forth herein and in each respective First Day Motion, the Court should grant the relief requested in each of the First Day Motions.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: December 8, 2021.
Houston, Texas

By: <u>*Michael Keener*</u>
Name: Michael Keener
